# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**Mohamed Fawzi**                        )

   4921 Seminary Rd               )

   Alexandria, VA 22311         )        **Civil Action No.**

                                 )

                    Plaintiff, v.   )

**Al Jazeera,**

   PO Box 23127                )

   Doha, Qatar                 )

                                 )

                   Defendant   )

## COMPLAINT FOR BREACH OF CONTRACT, NEGLIGENT MISREPRESENTATION. PROMISSORY ESTOPPEL, AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

**COMES NOW,** the Plaintiff herein, through undersigned counsel and hereby complains against Defendant Al Jazeera ("THE NETWORK") as detailed below:

### INTRODUCTION

Plaintiff has worked as a camera man for Defendant, Al Jazeera, and served in hot spots all over the globe for the past ten years. In order to advance Al Jazeera's mission, he has risked his life on numerous occasions, including a confrontation with the Taliban after they had surrounded him and his colleagues on their way back to a secure military base in Afghanistan. Before taking on his latest assignment in September 2013 and traveling to Al Jazeera's Cairo Bureau, senior NETWORK officials made various representations to the Plaintiff and failed to inform him of the dangerous political situation in Cairo. Plaintiff was assured, for example, that NETWORK officials had secured all necessary permits and licenses so that he and his crew could engage in reporting activities legally and not be detained by Egyptian Security authorities. That turned out to be a complete fabrication as detailed herein. The same officials failed to inform him that Al Jazeera, in effect, was creating news in Cairo by funding student

demonstrators affiliated with and/or members of the Muslim Brotherhood that was later designated as a terrorist group and funding other inappropriate activities in order to take down the Sisi regime. They also failed to provide an accurate assessment of the security situation in Cairo and a safe working environment to the Plaintiff. Finally, NETWORK official also failed to inform their staff in Egypt that they had received, via Qatar, warnings from heads of states and diplomats not to operate in Egypt and not to support the Muslim Brotherhood. As a result of these misrepresentations and material omissions of fact, Plaintiff can't work in the Middle-East, his specialty. He also suffers from coronary medical issues, high blood pressure, and extreme anxiety and depression. He has not only lost his family, he has also lost his country, i.e. he has been permanently de-nationalized which is a war crime (*See* South African Apartheid Litigation, 617 F. Supp. 2d 229 (S.D.N.Y. 2009). He will never be able to step foot in Egypt again, knowing that if he does, he will be arrested upon arrival and incarcerated just like his colleagues, and may face grave medical issues in prison. His fear is realistic based on his international reputation as a designated terrorist and because he was allegedly working as a collaborator with Muslim Brotherhood officials. As a result of the tortious conduct complained of herein, including reckless endangerment of Plaintiff's life, he will be confined to America for the rest of his life, where he continues to live as a fugitive and have limited and low-paying employment opportunities vis-à-vis the $120,000 salary he earned with Al Jazeera.

## JURISDICTION

1. This Court has federal jurisdiction based on 28 U.S.C 1332 regarding diversity of citizenship. Plaintiff is currently domiciled in Virginia and Al Jazeera's corporate headquarters is in Qatar.

## VENUE

2. Al Jazeera has maintained a local office here in Washington, DC for approximately ten years and has hired people here and has rented offices and so it has a history of substantial contact with this forum. Thus, it should certainly have contemplated being hailed into this Court based on the allegations made herein.

## PARTIES

3.  The Plaintiff Mohamed Fawzi ("Plaintiff") is an Egyptian national who has worked for Defendant Al-Jazeera for ten years as a professional camera man. This suit concerns his posting to Cairo in September 2013 at the request of Al Jazeera officials.

4.  Plaintiff has a home in Cairo and that is where his family is located.

5.  The Defendant Al Jazeera Media NETWORK ("AJMN" or the "NETWORK") is a multi- platform, multinational media conglomerate based in Doha, Qatar.

6.  AJMN is registered in Qatar as a government-owned enterprise.

7.  AJMN is owned by the Qatari government which in turn is controlled by Qatar's ruling family, the House of Thani.

8.  The Chairman of AJMN's Board of Directors is Sheikh Hamad bin Thamer Al Thani, cousin of Qatar's head of state the Emir Sheikh Tamim bin Hamad Al Thani.

9.  At all material times, AJMN owned and operated numerous news and media outlets including but not limited to the following:

    a.  Al Jazeera Satellite Channel, also known as Al Jazeera Arabic ("AJA"):  the NETWORK's flagship Arabic-language television news channel based in Doha.

    b.  Al Jazeera English ("AJE"): an English-language television news channel also based in Doha.

    c.  Al Jazeera Mubasher Misr ("AJMM"), also known as Al Jazeera Egypt Live: a Doha-based, Egypt-focused Arabic-language channel which suspended operation in December 2014.

## STATEMENT OF FACTS

10.  Based upon his ten year employment relationship with the NETWORK, Plaintiff had a reasonable basis for believing that the NETWORK would take all reasonable steps to  provide Plaintiff a safe work environment and refrain from committing any acts or omissions that would cause him and his family harm or imperil his freedom, health, safety and security.

11.  Plaintiff has consistently received excellent annual performance reviews and is well-thought of today as a dedicated and competent al –Jazeera employee. His services were deemed to be so valuable that

he was always sought out as a camera man when a new reporting crew was being assembled for overseas duty.

12. Given the nature and context of his ten year employment relationship with the NETWORK, the NETWORK owed Plaintiff a duty to exercise reasonable care at all times when he was working for the NETWORK. This was especially true when its officials were making material representations and disclosing any dangers that a new assignment posed due to the political situation in the country he was going to. At all relevant times, NETWORK officials knew that the Plaintiff would rely upon these representations and disclosures.

13. Unbeknownst to the Plaintiff, however, the NETWORK officials' representations made before Plaintiff accepted the Cairo assignment were false, inaccurate, misleading and negligently made. Unfortunately, the Plaintiff reasonably relied on these representations in deciding to continue his ten year employment with the NETWORK and accept a new assignment in Cairo. As a result, Plaintiff has suffered the severe injuries and damages described in the Causes of Action listed herein.

14. Plaintiff had no idea when he was being requested to work in Cairo that:

   a. From June 2012 to July 2013, Egypt was controlled by a Muslim Brotherhood- affiliated government headed by then president Mohamed Morsi (the "Morsi Government").

   b. Qatar provided the Morsi Government and Muslim Brotherhood officials with considerable financial and political backing.

   c. On July 3, 2013, Abdel Fattah al-Sisi, then head of the Egyptian armed forces and Minister of Defense, deposed the Morsi Government and installed a government which remains in power and enjoys the support of the Supreme Council of the Armed Forces (the "Sisi Government").

   d. Qatar, defendant NETWORK, and the Sisi Government had and continue to have an extremely antagonistic relationship because Al Jazeera has collaborated with Muslim Brotherhood officials to overthrow the Sisi regime and has literally created false news reports designed to embarrass the regime.

   e. Recognizing this extremely antagonistic relationship, On November 23, 2013, the head of

4

states of the Gulf Cooperation Council ("GCC") reached the "Riyadh Agreement" which committed the Qatari emir to implement changes to Qatar's foreign and domestic policies, including preventing Brotherhood and radical Islamists from appearing on Al Jazeera, restricting the network's criticism of Egypt and member Gulf nations, and refraining from harboring Brotherhood fugitives designated as terrorists in Egypt, UAE, and Saudi Arabia. The agreement was reached directly with the Qatari Emir, who is a cousin of Al Jazeera CEO chairman, Hamad bin Thamer Hamad Al Thani.

    f.   During both the Morsi and Sisi Governments, Qatar used the NETWORK to pursue its regional foreign policy objectives in the following ways:

        i.   During the Morsi Government's tenure, the NETWORK used Al Jazeera Mubasher Misr as a thinly veiled mouthpiece for pro-Morsi Government and pro-Muslim Brotherhood propaganda.

        ii.   During the Sisi Government's tenure, the NETWORK used AJMM to illegally broadcast inflammatory material in an attempt to undermine and destabilize the Sisi Government.

        iii.   At all material times, the NETWORK was aware that the Sisi Government viewed the NETWORK and especially AJMM as extensions of Qatar's foreign policy apparatus.

15. Unbeknownst to Plaintiff, his employer, Defendant NETWORK, was viewed by Egyptian officials as collaborating with the Muslim Brotherhood. As a result, he was visited by Egyptian security personnel at his house and was taken to a police station in order to be interrogated. Fortunately, he was not tortured at that time and was released eventually. His three colleagues Peter Greste, Baher Mohamed, and Mohamed Fahmy were not as fortunate and we tried and imprisoned for more than 400 days. On June 24, 2014 Peter Greste and Mohamed Fahmy were sentenced to seven years and Baher was given ten.

16. He was fortunate enough at that time to have a visa enabling him to travel to the United States. He had left his passport at the US embassy    in order to have his visa processed. Knowing his life was endangered, he immediately visited the embassy to retrieve his passport with a valid US visa. He

immediately booked an airline reservation and left the country, not knowing whether he would ever see family members again at some point.

17. He attempted to receive assistance from Al Jazeera, but received none at all. In fact he got the impression that they didn't want to have anything to do with him, once he raised the issue of not being licensed or authorized to report on news stories in Cairo.  Since he has been in America he has filed for asylum based on the allegations contained herein. While his asylum petition is pending, he is unable to work and now he is in a state of poverty. He has tried to find alternative employment, but that would require an employer that can use his international status (I-visa.)

18. He is in such a state of poverty that he has looked for food stamps, free psychological services and alternative free housing. He currently lives in an apartment, but will shortly be evicted because he can no longer afford the rent.

19. Plaintiff knew that, at all material times, Egyptian law required foreign media entities to have valid permits and licenses and journalistic recording and transmitting equipment had to be properly registered and licensed. Because of the ten year relationship that he had with Al Jazeera, Plaintiff assumed Al Jazeera officials had complied with these requirements. Plaintiff knew that, consistent with the implied terms of his contractual relationship, Al Jazeera officials would never jeopardize his life.

20. However, Plaintiff was never told that on September 3, 2013, an Egyptian administrative court banned AJMM from broadcasting in Egypt on the grounds that, *inter alia,* the station fabricated news, defamed the Egyptian armed forces, damaged national security, incited foreign countries against Egypt and was biased in favor of the Muslim Brotherhood (the "AJMM Ban").

21. Plaintiff eventually learned that on December 25, 2013, Egypt designated the Muslim Brotherhood as a terrorist organization and announced that participating in, funding or promoting the activities of the Muslim Brotherhood or its affiliates would be subject to punishment under the terrorism provisions of the Egyptian penal code. It was only in 2014 that the Plaintiff realized for the first time the extent to which AJMN officials were funding and promoting the activities of the Muslim Brotherhood.

22. The Plaintiff did not know that Egyptian Media Production City and Nile Sat had banned all Al Jazeera

channels from operating in Egypt and cancelled their operational and licenses prior to his arrival for his work. The Al Jazeera journalists Baher Mohamed and Mohamed Fahmy were presented for the first time with this document from the prosecutor during their retrial in 2015.

23. Based on the ten year relationship that the Plaintiff had with Al Jazeera, Plaintiff expected and relied upon the following implied terms of his contractual relationship and the convent of good faith and fair dealing:

    a.  the NETWORK would make all reasonable efforts to provide Plaintiff with a safe work environment having regard to the nature of his employment and the political and legal situation in Egypt.

    b.  the NETWORK would keep Plaintiff fully and accurately informed of any risks and dangers he might face in the course of his employment, e.g., revocation of permits and licenses.

    c.  the NETWORK would ensure that the AJE Cairo Bureau's staff, equipment and reportage were compliant with all Egyptian legal and regulatory requirements.

    d.  the NETWORK would refrain from committing any acts or omissions that would cause harm to Plaintiff and his family or imperil Plaintiff's freedom, health, safety or security.

    e.  the NETWORK would treat Plaintiff fairly and in good faith.

As described herein, Al Jazeera officials breached all of these implied terms of Plaintiff's employment relationship with the NETWORK.

24. Prior to Plaintiff beginning work for the NETWORK in Cairo, the following events occurred:

    a.  On or about July 3, 2013, on the same day the Sisi Government seized power, Egyptian security forces raided and shut down AJMM's Cairo office.

    b.  On or about August 16, 2013, Egyptian security forces shut down AJA's Cairo office in a late-night raid.

    c.  On or about August 29, 2013, four AJE journalists were arrested in Cairo after covering a street protest without proper accreditation. They were released four days later.

    d.  On or about September 2, 2013, Egyptian authorities raided the AJE Cairo Bureau's permanent

office and arrested an administrative assistant, charging him with running a channel without proper permits and possessing unlicensed equipment. Thereafter, the AJE Cairo Bureau had to operate out of rented rooms at the Cairo Marriott Hotel.

e.  On or about September 3, 2013, then AJE Cairo bureau chief Abdullah Moussa, who was not present for the previous day's raid, fearing for his personal safety, abruptly left Cairo for Doha and never returned. On or about September 3, 2013, as noted above, the AJMM Ban was decreed by an Egyptian administrative Court, making it final.

25. Unbeknownst to Plaintiff, in defiance of the ban, the NETWORK continued to broadcast AJMM in Egypt by means of the Arabsat satellite telecommunications NETWORK and the Internet.

26. At no point during Plaintiff's employment interview or at any other time prior to his posting in Cairo did NETWORK officials ever inform Plaintiff of the developments listed below:

a.  AJMM's Cairo offices had been raided shortly after the Sisi Government came to power in July 2013;

b.  AJMM had the legal status of a banned entity and had been permanently shut down;

c.  Four AJE journalists had been arrested and detained for working without proper accreditation;

d.  AJE Cairo Bureau's permanent office had been raided and an administrative assistant arrested;

e.   AJE Cairo bureau chief had abruptly left Egypt for Doha in the wake of the raid;

f.  Egyptian authorities were alleging that AJE was operating without proper permits and licenses; and that

g.  AJMM was broadcasting in Egypt in defiance of Egyptian law and putting all NETWORK employees at risk of arrest, long-term incarceration, and torture

27. Plaintiff did not know that, on or about September 5, 2013, AJE Cairo Bureau employee Heba Fahmy emailed NETWORK management in Doha expressing concerns that the NETWORK did not understand the risks created by (i) the current political situation in Egypt, (ii) the charges against the AJE Cairo Bureau's administrative assistant as describe herein, and (iii) the fact that Egyptian authorities had found AJE to be operating without proper permits and licenses (the "Heba Fahmy

Email"), and engaging in treasonous conduct violative of journalism ethics, i.e., creating or fabricating news.

28. He also did not know that same day that his supervisor, MOHAMMED Fahmy, had telephoned AJE's Doha-based Acting Executive Producer for the Middle East and North Africa and raised a number of security issues and warnings including the following.

    a.   Fahmy advised that two AJE Cairo producers wished to work from home due to concerns about the AJE Cairo Bureau's legal status and security situation in Egypt.

    b.   Fahmy advised that AJE's Cairo Bureau driver refused to drive a vehicle registered in the NETWORK's name for fear that Egyptian authorities would target the vehicle's occupants for harassment, arrest or detention.

    c.   Fahmy advised that in light of the AJMM Ban imposed days earlier by an administrative court it was imperative that AJE not broadcast content produced by either AJA or AJMM and conversely that AJA and AJMM not broadcast content produced by AJE. The Acting Executive Producer agreed that AJE and the NETWORK's other channels must be - and appear · to be - completely independent of each other.

    d.   Fahmy inquired if AJE was operating legally in Egypt.  The Acting Executive Producer responded to the effect that she was unsure and was working to ascertain AJE's legal status

29. Plaintiff also did not know that on September 7, 2013, Fahmy sent the NETWORK an email with the subject line "AJE Legal/Security Situation in Cairo".· In this email, Fahmy referenced the Heba Fahmy Email and offered to personally make enquiries about the NETWORK's legal status in Egypt.

30. Plaintiff also did now know on September 7, 2013, a private security contractor who had been retained by the NETWORK to protect AJE Cairo Bureau staff emailed NETWORK management in Doha and advised that it was imperative the NETWORK obtain clarification as to its legal status in Egypt. The reason being that the lives and safety of the camera crew the Plaintiff was working with would be in jeopardy and members of the crew, like the Plaintiff, could quite possibly be tortured and incarcerated.

31. Plaintiff was never informed that On September 8, 2013, a NETWORK manager based in Doha replied

to Fahmy's email of the previous day stating "I appreciate your concern about the legal issue but Doha management will deal with it from here. Please just focus on the production side at the moment and how we can best tell the story with the limitations we have". The story that was being put out was based on creating or fabricating news designed to embarrass the Sisi regime

32.  Nor was he ever informed that, the same day, a second Doha-based NETWORK manager emailed Fahmy stating that: "Going forward, I'd appreciate it if you could leave it to us to liaise with the authorities and, if you get any calls, to direct them to Doha HQ in the first instance".

33.  Plaintiff had no idea that, in addition to the September 8, 2013 emails described above, the NETWORK on numerous occasions from September through December 2013 had expressly or impliedly represented to MR. Fahmy that it had made or would make all reasonable efforts to ensure the safety and security and that of the Plaintiff and the crew members by, among other things, (i) ascertaining AJE's legal status in Egypt, (ii) complying with all Egyptian legal and regulatory requirements, and (iii) maintaining a non-adversarial relationship with Egyptian law enforcement and regulatory authorities.

34.  When informed by Mr. Fahmy of these representations, the Plaintiff reasonably relied on these representations and decided to remain in Cairo and continue his employment with the NETWORK. Had he not been informed of these representations, the Plaintiff would have stopped all of his camera crew responsibilities and immediately left Cairo. Unbeknownst to Plaintiff however, these representations were untrue, inaccurate, misleading and negligently made.

35.  Plaintiff did not know that on or about early September 2013, his supervisor, Mr. Fahmy requested that the NETWORK make efforts to secure Egyptian press accreditation for him and several other unaccredited AJE Cairo Bureau staff members. The NETWORK equivocated, stating that it was common practice for bureau chiefs and even reporters to work without accreditation. He also did not know that or about early December 2013, Fahmy again requested that the NETWORK make efforts to secure Egyptian press accreditation for him and several other unaccredited AJE Cairo Bureau staff. The NETWORK again equivocated.

36.  In light of the August 2013 arrest and detention of four AJE journalists for lack of accreditation and the

NETWORK's antagonistic and unlawful practices described herein, NETWORK officials knew or ought to have known that its failure to take all reasonable measures to secure press accreditation would put the Plaintiff and his family at heightened risk of being detained by Egyptian authorities and subject to long-term arrest, incarceration and torture.

37. Throughout late 2013 and unbeknownst to Plaintiff and his AJE Cairo Bureau colleagues, the NETWORK was also surreptitiously paying activist anti-Sisi-government members of the Muslim Brotherhood or its affiliates to produce video footage and other content for broadcast without attribution on the banned AJMM channel. In other words, the NETWORK was creating or fabricating news in order to embarrass the Sisi regime.

38. The NETWORK knew or ought to have known that this practice not only violated Egyptian law and basic journalism ethics but would also antagonize the Egyptian authorities and imperil the freedom, safety and security of Fahmy and his AJE Cairo Bureau colleagues.

39. From September through December 2013, the NETWORK further antagonized the Egyptian authorities by consistently broadcasting AJE "reporting packages" (i.e., content produced by the AJE Cairo Bureau) with Arabic voice-overs on the banned AJMM channel (the "Rebroadcasting Practice").

40. The NETWORK continued with the Rebroadcasting practice despite Fahmy's clear warnings against such conduct, which warnings were first expressed in the September 6, 2013 telephone call to the Acting Executive Producer described herein.

41. NETWORK knew or ought to have known that the Rebroadcasting Practice would and in fact did create the appearance that all AJE Cairo Bureau personnel were producing content for the banned AJMM channel in defiance of Egyptian law.

42. On September 27, 2013, immediately after he learned of the Rebroadcasting Practice, Fahmy emailed NETWORK management to caution them that the Rebroadcasting Practice was endangering the safety and security of all AJE Cairo Bureau personnel.

43. Later on September 27, 2013, a senior NETWORK manager in Doha replied by email stating "I will handle this.  Thank you for alerting me". That attitude of total indifference resulted in the injuries

complained of herein.

44. Despite the NETWORK's representation to the contrary, the NETWORK continued the Rebroadcasting Practice on at least five other occasions from October through December 2013 including the following:

    a. On several occasions including December 7 and 17, 2013, the NETWORK used AJE reporting packages as the basis for direct and heated criticisms of the Egyptian authorities during a primetime program illegally broadcast in Egypt on the banned AJMM channel.

    b. On or about late November 2013, the NETWORK rebroadcast an AJE reporting package about young Cairo day-laborers on the banned AJMM channel. . Immediately following the broadcast Fahmy and a colleague received telephone threats of violence from a man who had agreed to be interviewed for the story on the condition and with the assurance that it would not be broadcast on AJMM. Fahmy notified NETWORK management of these threats.

45. Plaintiff did not know that throughout October, November and December 2013, his supervisor Mr. Fahmy continued to raise his concerns about the Rebroadcasting Practice with the NETWORK. The NETWORK ·consistently represented to Mr. Fahmy that the practice would cease. That was not true. The NETWORK had consistently represented to Mr. Fahmy that the practice would cease immediately. That was not true, of course, much to the detriment of the Plaintiff and his colleagues.

46. Plaintiff recently learned that on or about December 27, 2013, just two days after Egyptian authorities designated the Muslim Brotherhood a terrorist organization, the NETWORK rebroadcast yet another AJE reporting package with Arabic voice-overs on the banned AJMM channel.

47. NETWORK officials knew, given the Egyptian political and legal situation, and the fact that four AJE journalists and an administrative assistant had already been arrested and detained in the summer of 2013, that by continuing to create or fabricate news reports, they were putting their staff at risk.

48. NETWORK officials knew or should have known that the arrest and imprisonment of Fahmy and other AJE Cairo Bureau staff was a foreseeable consequence of the NETWORK's antagonistic and unlawful practices described herein.

49. Plaintiff learned that, shortly after his arrest, Fahmy and several AJE employees, some of whom had

already left Egypt, were charged with the following violations of Egyptian criminal statutes:

    a.   Joining, promoting and supporting a terrorist organization, namely the Muslim Brotherhood.

    b.   Intentionally broadcasting news, statements and false rumors over the Internet and a satellite channel in a way that harmed public security, harmed the public interest, spread terror among the general public and created the false impression that Egypt was going through civil war and strife.

    c.   Possessing communications and broadcasting equipment without obtaining a permit, and

    d.   Creating or fabricating news that harms public security, public interest, spreads terror among the general public and creats the false impression that Egypt was going through civil war and strife.

50. Plaintiff eventually learned that on or about June 23, 2014, an Egyptian criminal court convicted Fahmy on all charges and sentenced him to a total of seven years' imprisonment being five years for the first charge noted above and one each for the second and third charge. Fahmy's colleagues, including the Plaintiff, were tried *in absentia* and were also convicted. The Plaintiff was sentenced to ten years in prison and was designated as an international terrorist.

51. Plaintiff's conviction was based in whole or in part on evidence of the following:

    a.   the NETWORK had paid activist anti-government members of the Muslim Brotherhood or its affiliates to produce video footage and other content for broadcast on the banned AJMM channel;

    b.   the NETWORK had aired AJE Cairo Bureau reporting packages on the banned AJMM channel; and

    c.   the NEWORK had not obtained permits required for various equipment used by the AJE Cairo Bureau.

52. As NETWORK officials knew or ought to have known:

    a.   the NETWORK's misrepresentations and omissions of material facts would and in fact did imperil Plaintiff's freedom, health, safety and security and that of his family;

b.  By continuing to engage in creating fictitious new reports, all NETWORK employees would be deemed to be collaborators with the Muslim Brotherhood.

53.  Examples of how the NETWORK failed the Plaintiff and breached the employment relationship are:

a.  The NETWORK failed or refused to make reasonable efforts to revoke Plaintiff's terrorist designation and the ten year sentence he had received,

b.  failed or refused to provide Plaintiff with the legal representation in order to rescind Plaintiff's terrorist designation and the ten year sentence he had received, and

c.  Plaintiff recently learned that NETWORK officials, in defiance of Egyptian law, continued to broadcast AJMM over satellite and the Internet, and continued to create or fabricate news reports designed to embarrass the Sisi regime.

54.  NETWORK officials had to realize the severe consequences of continuing to broadcast on AJMM in defiance of Egyptian law, i.e., they were creating or fabricating dishonest news reports designed to embarrass the Sisi regime. They knew that such conduct would endanger the lives and safety of all bureau employees.

**FIRST CAUSE OF ACTION: BREACH OF CONTRACT**

55.  Plaintiff repeats and re-alleges the allegations contained in paragraphs 54 as fully recited herein.

56.  As was his practice and custom, Plaintiff checked in with his superiors in Al Jazeera before departing for Cairo and they reassured him that the NETWORK had a license which was authorized by the Egyptian government. That turned out not to be true, much to the Plaintiff's detriment. Al Jazeera's ability to secure licenses and permits from foreign media agencies in numerous hotspots was considered to be part and parcel of his contractual relationship with Al Jazeera.

57.  During the years of his employment with Al Jazeera, he was constantly reassured by the superiors he worked for that if anything happened to him or his family, they would endeavor to protect him and make sure that he has legal representation and, if necessary, assistance in departing Cairo or any other hotspot in the world where he was reporting from.

58.  On or around December 2013, the Plaintiff was visited by Egyptian security personnel who escorted

him to a police station, the reason – his employer's ongoing relationship with the Muslim Brotherhood and its attempt to overthrow the Sisi regime by, inter alia, creating and fabricating news reports designed to embarrass the regime. The NETWORK and its senior officials were acting as collaborators with the Muslim Brotherhood, a crime under Egypt's penal code. He was released and fortunately, was not tortured.

59. It turned out that his superiors had not secured the appropriate permits and licenses. This was the basis for his arrest, and would have been the basis for his conviction had he not been able to escape Egypt on a US visa. Al Jazeera's refusal and/or inability to secure the appropriate licenses and permits, and misrepresentations made by its officials about the Plaintiff being lawfully licensed to report on news stories from Cairo, led to his arrest and incarceration. That would have ultimately led to his conviction and a ten year jail sentence had he not been able to depart Cairo on an American visa. The reason- his employer was continuing to collaborate with the Muslim Brotherhood in an attempt to embarrass and overthrow the Sisi regime.

60. Those misrepresentatiosn and omissions of material facts, and the NETWORK's failure to inform the Plaintiff of the dangerous conditions associated with the Cairo Bureau assignment breached the contract that Plaintiff had with Al Jazeera. As a result of that breach, Plaintiff has been damaged in the sum of $2.4 million because he is no longer able to work in the Middle East, which was his specialty. His reputation has been ruined, i.e., he is now deemed to be an international terrorist. He is unable to find alternative employment and was also forced to apply for asylum to be able to stay in America. If he attempts to work in the Middle East, he can be assured of one thing, the Egyptian government will immediately arrest him, incarcerate him, and torture him. For the rest of his life, he is going to be confined to America and will have no interaction with his family members.   Under the present circumstances, he is unable to visit Middle East or see family members and will never be able to enter the home in Cairo where he grew up and where his family members now reside.

61. In summary, as a result of the tortious conduct engaged by the NETWORK, he has suffered the following damages:

a. Loss of wages

b. Loss of future wages as a result of his inability to work in the Middle-East and certain countries in Europe.

c. Attorney fees incurred in applying for asylum in America.

d. Attorney fees incurred in preparing and filing this lawsuit.

e. The emotional distress, extreme anxiety, depression, and trauma resulting from the realization that he is a man without a country and has, in fact, been de-nationalized.

f. The emotional distress, extreme anxiety, depression, and trauma resulting from his inability to interact with and live with his wife and children who are now confined to Cairo.

g. The emotional distress, extreme anxiety, depression, and trauma that the Plaintiff suffers from as a result of being labeled an international terrorist by the Egyptian Government. That terrorist definition and his criminal conviction requires that he remain in America for the rest of his life. That designation also precludes future job opportunities for him in America.  It also means that family members, like his son who has a valid pilot's license, will never be able to land a job with a Middle-East air carrier.

h. The deteriorating physical condition that he now finds himself in - high blood pressure, coronary health issues, daily medication, and extreme anxiety and depression.

**SECOND CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION**

62. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 – 61 as fully recited herein.

63. In early September 2013, Plaintiff was requested by his superiors to travel to Cairo and work at the Al Jazeera bureau located in Cairo.

64. Before leaving, he was assured by NETWORK officials that they had secured all the necessary licenses and permits to function as international overseas reporters. Had the Al -Jazeera superiors actually told him the truth, i.e., that they had not procured the necessary license or permit, Plaintiff would have never travelled to Cairo, knowing what that could possibly entail i.e., arrest, a lengthy incarceration and possibly torture.

65. Plaintiff started to perform his duties in September 2013, but he was arrested and accused because the NETWORK was allegedly working with Muslim Brotherhood officials. As that charged pertained to the Plaintiff, this was a made up accusation because he never had any involvement with the Muslim League personnel and did not identify with the goals of that organization.

66. As a result of not procuring the necessary licenses and permits, Plaintiff was operating on Egyptian soil as an unlicensed international media crew member. As a result, Plaintiff's reputation has been severely damaged and he also has a ten year prison sentence hanging over his head if he ever returned to Cairo and for that matter if he ever returned to the Middle East.

67. As a result of being lied to about the material facts detailed herein, Plaintiff has suffered significant injuries. Plaintiff has been damaged in the sum of $2.4 million because he is no longer able to work in the Middle East, which was his specialty. He has lost salary, employment benefits, overtime pay, his reputation has been impaired i,e. he has been designated as a terrorist under Egypt's penal code. As a result of the tortious activities committed by NETWORK officials, he is unable to find alternative employment and was also forced to apply for asylum to stay in America. He will be confined to America for the rest of his life. He also suffers from severe emotional distress because he has lost his identity as an Egyptian citizen. In other words, he has been de-nationalized [a war crime] as a result of the tortious conduct detailed herein. He also suffers from severe emotional distress because he is unable to be with his wife and his children, i.e. he has not only lost his country but his family also. He also realizes that he would never be able to live in his homeland or be buried in it alongside his parents. As a result of this conduct, in addition to a compensatory damages award, he also seeks a punitive damages award from this Court in the amount of five million dollars for the outrageous conduct complained of herein.

68. In summary, Plaintiff has suffered the following damages:

    a. Loss of wages

    b. Loss of future wages as a result of his inability to work in the Middle-East and certain countries in Europe.

c.  Attorney fees incurred in applying for asylum in America.

d.  Attorney fees incurred in preparing and filing this lawsuit.

e.  The emotional distress and trauma resulting from the realization that he is a man without a country and has, in fact, been nationalized.

f.  The emotional distress and trauma resulting from his inability to interact with and live with his wife and children who are now confined to Cairo.

g.  The emotional distress and trauma that the Plaintiff suffers from is a direct result of being designated as an international terrorist by the Egyptian Government. That terrorist designation and conviction in absentia requires that he remain in America for the rest of his life. That designation precludes future job opportunities for him in America. That designation also means that family members, like his son who has a valid pilot's license, will never be able to fly for any Middle East air carrier.

### THIRD CAUSE OF ACTION: PROMISSORY ESTOPPEL

69. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1- 68 as fully recited herein

70. As detailed in the Statement of Facts, before the Plaintiff agreed to being assigned to Cairo, various representations were made to him including the fact that Al Jazeera NETWORK officials had secured all the appropriate licenses and permits so that Plaintiff's crew could operate lawfully in Cairo and not be detained by Egyptian special police.

71. Based on the ten-year employment relationship that Plaintiff had with Al Jazeera, he assumed that NETWORK officials were telling the truth, especially because, if they weren't, his life could be in danger, as well as family members.

72. As a result of his reliance on these misrepresentations, Plaintiff accepted the Cairo assignment and traveled there to start his work in Al Jazeera Cairo bureau.

73. Because he relied on representations made by senior Al Jazeera officials, and was not told the truth about the deteriorating political climate under the Sisi regime, he was arrested, and only because he had an American visa he was able to escape Cairo. If he had not had that visa, he would have been

convicted for being a terrorist and a collaborator with Muslim Brotherhood Officials and would have been sentenced to ten years in prison and most likely tortured.

74. In summary, the Plaintiff has suffered the following damages:

    a. Loss of wages

    b. Loss of future wages as a result of his inability to work in the Middle-East and certain countries in Europe.

    c. Attorney fees incurred in applying for asylum in America.

    d. Attorney fees incurred in preparing and filing this lawsuit.

    e. The emotional distress and trauma resulting from the realization that he is a man without a country and has, in fact, been nationalized.

    f. The emotional distress and trauma resulting from his inability to interact with and live with his wife and children who are now confined to Cairo.

    g. The emotional distress and trauma that the Plaintiff suffers from is a direct result of being designated as an international terrorist by the Egyptian Government. That terrorist designation and conviction in absentia requires that he remain in America for the rest of his life. That designation precludes future job opportunities for him in America. That designation also means that family members, like his son who has a valid pilot's license, will never be able to be employed for a Middle East air carrier.

WHEREFORE, based on the allegations contained herein, Plaintiff requests judgment be entered against the NETWORK for $2.4 million. As already referenced herein, he also seeks a punitive damages award for $5 million based on the outrageous conduct engaged in by NETWORK officials.

**FOURTH CAUSE OF ACTION: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

75. Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-74 as fully recited herein.

76. As detailed in the Statement of Facts, before the Plaintiff agreed to being assigned to Cairo, various representations were made to him including the fact that NETWORK officials had secured all the appropriate licenses and permits so that Plaintiff's crew could operate lawfully in Cairo and not be

detained by Egyptian special police.

77. Based on the ten-year employment relationship that Plaintiff had with Al Jazeera, he assumed that NETWORK officials were telling him the truth, especially since his life would be in danger as well as his family's if that wasn't the case.

78. Because he relied on representations made by senior Al Jazeera officials, and was not told the truth about the deteriorating political climate under the Sisi regime, he was arrested, and only because he had an American visa he was able to escape Cairo.

79. At the time that NETWORK officials were making these representations and failing to disclose material facts to the Plaintiff, they were knowingly putting his life at risk and jeopardizing his family as well. They engaged in this reckless behavior knowing that their negligent misrepresentations and omissions of material fact would be relied on by the Plaintiff and influence him in terms of accepting the Cairo assignment. As a result of the tortious conduct described herein, the Plaintiff has suffered extreme emotional distress arising out of the NETWORK officials' reckless indifference for his health and safety, i.e. their refusal to secure appropriate permits and licenses to ensure that NETWORK crew members, including Plaintiff, would not be arrested by Egyptian security authorities and tortured based on the NETWORK's substantial support to the Muslim Brotherhood.

80. At all relevant times, these officials knew that the Egyptian Government had concluded that Al Jazeera had significant ties to the Muslim Brotherhood and was working with Muslim Brotherhood officials to bring down the Sisi Government. They also knew that by continuing to work with MB officials and re-broadcasting and creating news, the Plaintiff's life would be placed in jeopardy and that of his family. Nonetheless, NETWORK officials continued to work with Muslim Brotherhood officials and knew that, as a consequence, any NETWORK employee would be deemed to be a collaborator and supporter of the Muslim Brotherhood. That was the criminal charge made against the Plaintiff when he was convicted in absentia and sentenced to ten years in prison.

81. In summary, Plaintiff has suffered the following damages:

    a.  Loss of wages

b.  Loss of future wages as a result of his inability to work in the Middle-East and certain countries in Europe.

c.  Attorney fees incurred in applying for asylum in America.

d.  Attorney fees incurred in filing and preparing this lawsuit and in launching a campaign to revoke his terrorist designation and the ten year prison sentence he faces if traveling to Egypt.

e.  Attorney fees incurred in preparing and filing this lawsuit.

f.  The emotional distress and trauma resulting from the realization that he is a man without a country and has, in fact, been de-nationalized, a war crime.

g.  The emotional distress and trauma resulting from his inability to interact with and live with his wife and children who are now confined to Cairo.

h.  The emotional distress and trauma that the Plaintiff suffers is a direct result of being designated an international terrorist by the Egyptian Government. That terrorist definition and his criminal conviction requires that he remain in America for the rest of his life. That designation also precludes future job opportunities for him in America. That designation also means that family members, like his son who has a valid pilot's license, will never be employed by a Middle-East air carrier.

WHEREFORE, based on the allegations contained herein, Plaintiff requests judgment be entered against the NETWORK for $2.4 million. As already referenced herein, he also seeks a punitive damages award for $5 million based on the outrageous and reckless conduct engaged in by NETWORK officials. These officials knew, at all relevant times, that by assigning the Plaintiff to the Cairo Bureau, it was almost guaranteed he would be arrest, incarcerated, and tortured.

_____

Attorney for Plaintiff,

Martin F. McMahon

21

## JURY DEMAND

Plaintiff hereby demands that a jury hear and determine all triable factual issues arising out of this

lawsuit.

_____

Attorney for Plaintiff,

Martin F. McMahon, Esq.

1150 Connecticut Ave,

Washington, DC 20016